# MISSOURI PACIFIC RAILWAY COMPANY *v.* McFADDEN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS.

No. 318. Argued and submitted March 22, 1894. — Decided May 26, 1894.

If a railroad company, for its own convenience and the convenience of its customers, is in the habit of issuing bills of lading for cotton delivered to a compress company, to be compressed before actual delivery to the railroad company, with no intention on the part of the shipper or of the carrier that the liability of the carrier shall attach before delivery on its cars, and the cotton is destroyed by fire while in the hands of the compress company, the railroad company is not liable for the value of the cotton, so destroyed, to an assignee of the bill of lading without notice of the agreement and course of dealing between the shipper and the carrier.

THE defendants in error (plaintiffs below) sued in the Circuit Court of Hunt County, Texas, to recover the value of two hundred bales of cotton, alleged to have been shipped from Greenville, Texas, to Liverpool, England, the shipments having been evidenced by two bills of lading, each for one hundred bales of cotton.

On application of the defendant below, the case was removed to the Circuit Court of the United States for the Northern District of Texas. After filing the record in that court, the pleadings were amended. The amended answer set up the following, among other special defences, on behalf of the company :

"First. That while it is true that it had issued certain bills

of lading for said cotton, said cotton had not yet in deed and in truth been delivered to it. It was the habit and the custom of defendant, and well known to plaintiffs to be such, after cottons were placed on the platforms at the compress in Greenville, before the same was compressed, it would issue bills of lading therefor to consignors desiring to ship. Said cottons would be delivered to the compress for the purpose of compressing, and that at the time they were so delivered to it the superintendent of the compress or the agent of the compress would check out such cottons intended and the shipper would make out a bill of lading, which would be O. K.'d by the superintendent of the compress or its agent, and afterwards it would be brought to the agent of the defendant and by him signed up, and defendant would actually receive said cotton only after it was compressed and delivered upon its cars. This course was pursued as a matter of convenience by the compress company and the shipper, but it was not intended by either the shipper or the defendant that the liability of the defendant should attach until the cotton was actually delivered upon its cars. This custom was well known to the plaintiffs, George H. McFadden & Bro. and to A. Fulton & Co., and the bills of lading were made out according to this custom by A. Fulton & Co. as herein shown, and accepted by A. Fulton and Co. according to such custom. At the time said bills of lading were made the cotton was in the hands of the compress according to the custom aforesaid, and had never been delivered to defendant, the defendant's liability as a common carrier had never attached, nor had any liability attached, but said cotton, while it was in the hands of the compress company, was wholly destroyed by fire and never came to the hands of defendant. Defendant says said cotton was placed on said platform at said compress for the purpose of being compressed by A. Fulton & Co.; that they well knew, intended, and expected said cotton should be compressed before it was shipped. Said cotton while at the compress was under the control of A. Fulton & Co. or their agent the compress company."

The answer thereupon proceeded to set out other matters to which it is unnecessary to refer.

The plaintiff replied to the amended answer and excepted to the first count, as follows:

"And they specially except to the first count in defendant's special answer, in so far as the same attempts to set up a custom of the manner of receiving cotton and issuing bills of lading, because the same does not show that the custom was such as is recognized and binding in law, but attempts to set up a custom which is contrary to law, and because the same does not show that it was such a custom as would relieve the defendant from liability on a contract in writing."

The reply then proceeded to except to other parts of the defendant's answer.

The court sustained the plaintiffs' exception to the first count of the amended answer, to which ruling exception was reserved. Thereupon the facts were stated to be, 1st, that the bills of lading had been issued to Fulton & Co.; 2d, that they were assigned to the plaintiffs; 3d, that the value of the cotton was $8647.83 at the time it was destroyed, and that the defendant had never paid therefor.

Upon this evidence, the case was submitted to the court without a jury, and the court found for the plaintiffs and gave judgment for the value of the cotton. The case was brought here by writ of error.

*Mr. James Hagerman* and *Mr. Joseph M. Bryson,* for plaintiff in error, submitted on their brief.

*Mr. George Wharton Pepper,* (who, on motion of *Mr. George F. Edmunds,* had been granted leave to appear for the purpose of arguing this case orally), for defendants in error. *Mr. J. Bayard Henry* was with him on his brief. To the point on which the case was decided he said:

The liability of the defendant as carrier attached upon the execution and delivery of the bills of lading, and prior to the destruction of the cotton by fire.

Upon this point the finding of the learned judge in the court below was as follows: "After the signing of said bills by the defendant, its duty and liability as a common carrier commenced."

In a case before the Supreme Court of Texas, which grew out of much the same facts as those upon which this case depends, *Missouri Pacific Railway* v. *Sherwood*, 19 S. W. Rep. 455 (1892), the defendant company does not appear to have thought it worth while to contend that its liability as carrier had not attached at the time of the fire. The state court, following the decision of Judge McCormick, seems to have considered it too clear for argument that when the shipper had parted with all control and custody of the goods, and the carrier, by its bill of lading, had acknowledged the receipt of them, the liability of the carrier, whether limited or unlimited, attached *eo instanti.*

Now, however, the learned counsel for the plaintiff in error strenuously contend that the liability of the carrier had not accrued at the time of the fire, and they cite in support of the proposition several decisions, which, upon examination, are found (it is submitted) to have no bearing upon the case in hand.

Considering the case first upon principle, it will, of course, be admitted that the giving of the bill of lading for the goods raises a *prima facies* that the carrier has received them. Such a *prima facies* may be set aside by proof that the issuing of the bill was due to mistake, or fraud, or misrepresentation. But the delivery of the bill " is said to be very high and authentic evidence " not only of the receipt of the goods, but " of both the quantity and condition of the goods when they were received, though not an estoppel to show the truth." Hutchinson on Carriers, 2d. ed. § 122.

How is it sought in this case to set the presumption aside? No error, or fraud, or mistake is even averred. The railway company places its whole reliance upon an alleged " custom " in force at Greenville, according to which all cotton to be shipped over the defendant's road was by public invitation of the defendant, deposited upon a platform controlled by a compress company, which company is admitted by the defendant to have been a party to an agreement with the carrier, according to which the carrier issued a bill of lading immediately upon receiving notice of the deposit of the cotton. It

is almost preposterous to contend that there is in such a custom any feature which in any respect varies the carrier's liability. Either the custom is consistent with the unqualified acceptance of which the bill of lading is evidence, or it is a custom which, by the making of the bill, the parties have excluded by their contract.

These considerations, deduced from principle, are in nowise inconsistent with the cases cited by the plaintiff in error. For example: in *Iron Mountain Railway* v. *Knight,* 122 U. S. 79 (1886), the question was whether the recital in a bill was conclusive as to the quality of cotton shipped. The cotton had been shipped to Texarkana, to be there made up into bales at a compress-house by the carrier under the direction of the shipper, who, from time to time, selected bales of different quality for shipment, but the bills were often issued before the particular bales were separated from the mass. Obviously, therefore, the liability of the defendant as a carrier could not begin until the property which it was to carry was identified. But, more than this, the case is actually favorable to our contention, for Mr. Justice Matthews could not have used language more applicable to the present case than that which is found on page 93 : " It may be said that the defendant's liability as a common carrier commenced at a time antecedent to the delivery of the cotton to be loaded on the cars ; that it might have arisen upon a prior delivery of the cotton in question in the warehouse to be compressed, and then transported, the duty of compressing it, in order to prepare it for transportation, having been undertaken by the defendant. This, however, could only be where the specific goods, as the property of the plaintiffs, were delivered for that purpose into the exclusive possession and control of the defendant." It will be perceived at a glance that the condition of the carrier's liability, in conformity with the view of the learned justice, is entirely satisfied by the facts of this case.

Mr. Justice White, after stating the case, delivered the opinion of the court.

Many questions were discussed at bar which we deem it unnecessary to notice, as we consider that the whole case depends upon the correctness of the judgment of the court below in sustaining the exception to the first defence in the amended answer. That defence averred that the cotton for which the bills of lading were issued was never delivered to the carrier; that by a custom or course of dealing between the carrier and the shipper it was understood by both parties that the cotton was not to be delivered at the time the bills of lading were issued, but was then in the hands of a compress company, which compress company was the agent of the shipper; and that it was the intention of the parties at the time the bills of lading were issued that the cotton should remain in the hands of the compress company, the agent of the shipper, for the purpose of being compressed, and that this custom was known to the plaintiffs and transferees of the bills of lading; and that, whilst the cotton was so in the hands of the compress company, the agent of the shipper, and before delivery to the carrier, it was destroyed by fire.

All of these allegations in the answer were, of course, admitted by the exception, and, therefore, the case presents the simple question of whether a carrier is liable on a bill of lading for property which at the time of the signing of the bill remained in the hands of the shipper for the purpose of being compressed for the shipper's account, and was destroyed by fire before the delivery to the carrier had been consummated. The elementary rule is that the liability of a common carrier depends upon the delivery to him of the goods which he is to carry. This rule is thus stated in the text-books: "The liability of a carrier begins when the goods are delivered to him or his proper servant authorized to receive them for carriage." Redfield on Carriers, 80. "The duties and the obligations of the common carrier with respect to the goods commence with their delivery to him, and this delivery must be complete, so as to put upon him the exclusive duty of seeing to their safety. The law will not divide the duty or the obligation between the carrier and the owner of the goods. It must rest entirely upon the one or the other; and until it

has become imposed upon the carrier by a delivery and acceptance he cannot be held responsible for them." Hutchinson on Carriers, 82.

This doctrine is sanctioned by a unanimous course of English and American decisions. *Schooner Freeman* v. *Buckingham*, 18 How. 182; *The Lady Franklin*, 8 Wall. 325; *The Delaware*, 14 Wall. 579; *Pollard* v. *Vinton*, 105 U. S. 7; *Iron Mountain Railway* v. *Knight*, 122 U. S. 79; *Friedlander* v. *Texas & Pacific Railway*, 130 U. S. 423; *St. Louis, Iron Mountain &c. Railway* v. *Commercial Union Ins. Co.*, 139 U. S. 233; *Barron* v. *Eldredge*, 100 Mass. 455; *Moses* v. *Boston & Maine Railroad*, 4 Foster, (24 N. H.) 71; *Brind* v. *Dale*, 8 Car. & P. 207; *Selway* v. *Holloway*, 1 Ld. Raym. 46; *Buckman* v. *Levi*, 3 Camp. 414; *Leigh* v. *Smith*, 1 Car. & P. 638; *Grant* v. *Norway*, 10 C. B. 665; *Hubbersty* v. *Ward*, 8 Exch. 330; *Coleman* v. *Riches*, 16 C. B. 104. Indeed, the citations might be multiplied indefinitely.

Whilst the authorities may differ upon the point of what constitutes delivery to a carrier, the rule is nowhere questioned that when delivery has not been made to the carrier, but, on the contrary, the evidence shows that the goods remained in the possession of the shipper or his agent after the signing and passing of the bill of lading, the carrier is not liable as carrier under the bill.

Of course, then, the carrier's liability as such will not attach on issuing the bill in a case where not only is there a failure to deliver but there is also an understanding between the parties that delivery shall not be made till a future day, and that the goods until then shall remain in the custody of the shipper. Does the fact that the plaintiffs claim to be assignees of the bill of lading without notice of the agreement and course of dealing between the shipper and the carrier confer upon them greater rights as against the carrier than those which attach under the bill of lading in the hands of the parties to whom it was originally issued and who made the agreement?

It is to be remarked, in considering this question, that the averment of the answer, which was admitted by the exception, charged that the course of dealing between the parties

in accordance with which the goods were not delivered at the time of the issuance of the bills of lading, but remained in the hands of the · compress company, which was the agent of the shipper, was known to the plaintiffs, the holders of the bills of lading. It is clear that, whatever may be the effect of custom and course of dealing upon the question of legal liability, proof of such ·custom and course of dealing would have been admissible, not in order to change the law, but for the purpose of charging the plaintiffs, as holders of the bills of lading, with knowledge of the relations between the parties.

That a bill of lading does not partake of the character of negotiable paper, so as to transfer to the assignees thereof the rights of the holder of such paper, is well settled. Said this court in *Pollard v. Vinton*, 105 U. S. 7, 8 :

" A bill of lading is an instrument well known in commercial transactions, and its character and effect have been defined by judicial decisions. In the hands of the holder it is evidence of ownership, special or general, of the property mentioned in it, and of the right to receive said property at the place of delivery. Notwithstanding it is designed to pass from hand to hand, with or without endorsement, and it is efficacious for its ordinary purposes in the hands of the holder, it is not a negotiable instrument or obligation in the sense that a bill of exchange or a promissory note is. Its transfer does not preclude, as in those cases, all inquiry into the transaction in which it originated, because it has come into the hands of persons who have innocently paid value for it. The doctrine of *bona fide* purchasers only applies to it in a limited sense.

" It is an instrument of a twofold character. It is at once a receipt and a contract. In the former character it is an acknowledgment of the receipt of property on board his vessel by the owner of the vessel. In the latter it is a contract to carry safely and deliver. The receipt of the goods lies at the foundation of the contract to carry and deliver. If no goods are actually received, there can be no valid contract to· carry or to deliver." See also *The Lady Franklin*, 8 Wall, 325.

The rule thus stated is the elementary commercial rule. Indeed, in the case last cited this court expressed surprise that the question should be raised.   These views coincide with the rulings of the English courts.   The cases of *Grant* v. *Norway*, 10 C. B. 665, and *Hubbersty* v. *Ward*, 8 Exch. 330, were both cases where bills of lading were issued and held by third parties.   The rule was uniform in England until the passage of the Bills of Lading Act, 18; 19, Vict. c. 111, § 3, making bills of lading in the hands of consignees or endorsees for value conclusive as to shipment.

Under these elementary principles we think there was manifest error below in maintaining the exception to the first count in the amended answer.   Of course, in so concluding we proceed solely upon the admission which the exception to the answer necessarily imported, and express no opinion as to what would be the rule of law if the compress company had not been the agent of the shipper, or if the goods had been constructively delivered to the carrier through the compress company, who held them in the carrier's behalf.

The judgment is

*Reversed and the case remanded for further proceedings in accordance with this opinion.*

MR. JUSTICE JACKSON, not having heard the argument, took no part in the decision of this cause.